## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**JAMES RANDALL PETRY,**

**Plaintiff,**

**vs.**                                   **CIVIL ACTION NO. 2:17-CV-01336**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

**Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered February 23, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 13 and 16.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 13.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 16.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

## Procedural History

The Plaintiff, James Randall Petry (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on February 14, 2011 alleging disability since December 10, 2010 because of "congestive heart failure, heart surgery, lower back pain, kidney dysfunction, high blood pressure, diabetes, and arthritis of the left shoulder." (Tr. at 158-164, 207.) In a decision dated August 17, 2012, the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ") found Claimant had severe impairments of coronary artery disease, coronary bypass grafting, left shoulder impingement syndrome, diabetes mellitus, obesity, borderline intellectual functioning, depression, and anxiety. (Tr. at 15.) However, the ALJ determined that the limitations arising from these impairments would not prevent Claimant from performing a limited range of light work, and therefore found him not disabled. (Tr. at 31-32.)

Claimant appealed the ALJ's decision and on September 30, 2015, this Court remanded the matter back to the Commissioner for further administrative proceedings because the ALJ did not perform the requisite adaptive functioning analysis required by Listing 12.05C.[1] (Tr. at 772.) Prior to the Court's remand, on April 15, 2015, Claimant filed subsequent DIB and SSI applications again alleging disability beginning on December 10, 2010. (Tr. at 924-936.) Due to this Court's remand of his prior claims, the ALJ consolidated them at the administrative hearing level. (Tr. at 631.)

A second administrative hearing was held on August 24, 2016 before ALJ Tilley. (Tr. at 660-693.) On November 18, 2016, the ALJ entered an unfavorable decision. (Tr. at 628-659.)

On February 21, 2017, Claimant timely brought the present action seeking judicial review

---

[1] See Petry v. Colvin, No. 2:13-cv-32835, 2015 WL 5786769 (Sept. 30, 2015) (M.J. VanDervort). (Tr. at 757-772.)

of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 10 and 11.) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (Document No. 13.), in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 16.), to which Claimant filed his Response. (Document No. 17.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was born on December 20, 1963 and considered a "younger person" as of his alleged onset date, and then became a "person closely approaching advanced age" before this Court remanded the case back to the ALJ. See 20 C.F.R. §§ 404.1563(c)-(d), 416.963(c)(d). (Tr. at 647.) Claimant went to school through the tenth grade, he did not attend special education classes, but he did not obtain a GED. (Tr. at 56, 208.) He last worked on December 16, 2010 as a truck driver hauling coal; this date is significant for his coronary artery bypass grafting. (Tr. at 57, 664.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through June 30, 2015. (Tr. at 634, Finding No. 1.) At the first step in the sequential evaluation process, the ALJ found that Claimant engaged in substantial gainful activity from January 2010 through December 2010, but he had not engaged in substantial gainful activity since

---

disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

December 2010.[3] (Id., Finding Nos. 2 and 3.)

Under the second inquiry, the ALJ found that Claimant had the following severe impairments: coronary artery disease; coronary artery bypass graft (CABG) x2; left shoulder impingement syndrome; diabetes mellitus; obesity; depression; anxiety; and borderline intellectual functioning. (Id., Finding No. 4.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 636, Finding No. 5.)

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work:

> He can perform lifting and carrying of no more than 20 pounds occasionally and up to 10 pounds frequently; sitting for 6 hours, and standing and walking for 6 hours, in an 8-hour work day. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl, but may never climb ladders, ropes or scaffolds. He can occasionally reach with the left nondominant extremity. He can tolerate occasional exposure to extreme heat, cold, wetness, vibration and respiratory irritants including fumes, odors, dusts, gases and poor ventilation as well as hazards. He retains the capacity to understand, remember and carry out simple, routine and repetitive tasks. He can respond appropriately to occasional superficial interaction with co-workers and supervisors where there is no requirement for teamwork or over the shoulder supervision. He should not interact with the general public. Work production should not involve fast-paced production requirements and should require few, if any, work related decisions.

(Tr. at 639-640, Finding No. 6.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 647, Finding No. 7.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that

---

[3] The record shows that just before the second administrative hearing, Claimant, by counsel, amended his alleged onset date to January 16, 2010 on August 21, 2016. (Tr. at 946.) At the hearing on August 24, 2016, however, Claimant amended his alleged onset date to December 16, 2010. (Tr. at 663.) Claimant previously amended his alleged onset date to December 16, 2010, the date of his heart surgery, on or about December 12, 2011. (Tr. at 188-189.)

there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 647-648, Finding Nos. 8-11.)

Finally, the ALJ determined Claimant had not been under a disability from January 16, 2010 through the date of the decision. (Tr. at 649, Finding No. 12.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two main errors in support of his appeal.

First, Claimant argues that the ALJ erred by failing to provide an adequate explanation in her finding that he did not meet Listing 12.05C criteria, and also because she failed to find that the evidence medically met or equaled the Listing. (Document No. 13 at 2-3.) Claimant points out that his full scale IQ score of 70 when he was fourteen was not properly reconciled with his scores achieved as an adult, and that the ALJ did not consider the additional help Claimant received when he was in school, and that he repeated a grade. (Id. at 3-5.) Further, the ALJ did not consider the nature of Claimant's past relevant work, and that he suffered from numerous physical complaints that clearly rendered him incapable of performing his past work, thus the ALJ's decision that he did not satisfy 12.05C criteria was not supported by substantial evidence. (Id. at 5.)

As for his second alleged ground, Claimant argues that the ALJ failed to consider his limitations in lifting, reaching and standing in the RFC assessment, when the evidence showed that he would be limited in reaching in all directions with his left upper extremity and that he was unsteady when standing on each leg. (Id. at 5-7.) Claimant asserts that in the previous decision, the ALJ found that he was limited to lifting only ten pounds with the left arm, but did not find any such limitation in the subsequent decision; the ALJ also incorrectly noted that State agency medical expert, Thomas Lauderman, D.O., opined that Claimant could reach frequently in all

directions with his left upper extremity, and failed to reconcile this finding. (<u>Id</u>. at 7.)

Claimant asks the Court to reverse the final decision and award him benefits, or in the alternative, remand this case to correct these errors. (<u>Id</u>. at 8.)

In response, the Commissioner argues Claimant did not meet 12.05C criteria, specifically because the evidence did not show that he had adaptive functioning deficits that manifested prior to age 22. (Document No. 16 at 13-15.) The Commissioner points out that Claimant's past work over the course of several years included skilled and semi-skilled level work, and that he had a valid commercial driver's license, undermine his allegations that he had significant deficits in adaptive functioning. (<u>Id</u>. at 15.) Moreover, Claimant's activity of daily living, including reading, handling a checkbook, performing household chores, attending doctor's appointments also do not support a finding for adaptive functioning deficits to satisfy 12.05C criteria. (<u>Id</u>.) Claimant's social functioning also did not suggest he had such deficits. (<u>Id</u>. at 16.) The Commissioner adds that despite Claimant's argument otherwise, the ALJ did reconcile Claimant's IQ scores with his academic record, but these showed he had academic difficulties and behavior issues, not adaptive functioning deficits. (<u>Id</u>.)

Next, the Commissioner argues that the ALJ considered and accounted for all of Claimant's credibly established limitations, including his left upper extremity. (<u>Id</u>. at 16-17.) With respect to his argument that the ALJ did not specifically include the lifting limitation, the Commissioner asserts that the ALJ asked the vocational expert about the limitation, however, the testimony supported a finding that Claimant nonetheless could still perform sedentary work that existed in significant numbers. (<u>Id</u>. at 18.) Additionally, the Commissioner contends that the ALJ properly accounted for Claimant's standing limitations in her hypothetical questions to the vocation expert,

who testified that there would still be a significant number of sedentary jobs Claimant could perform. (Id. at 19.) With regard to the transcription error that Dr. Lauderman found Claimant could perform frequent overhead reaching with the left upper extremity, the Commissioner states this inadvertent error is of no consequence, because the ALJ's RFC assessment provided that Claimant was limited to only occasional reaching. (Id.)

The Commissioner states that her final decision is supported by the substantial evidence and asks this Court to affirm. (Id. at 20.)

Claimant replies that his limitations in reaching and standing reducing him to sedentary work is critical because Rule 201.10 of the Medical-Vocational Guidelines direct a finding of disabled for an individual at age 50 with Claimant's past work and education. (Document No. 17 at 1-2.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

**Medical Records:**

Charleston Area Medical Center (CAMC):

On December 11, 2009, Claimant presented to the CAMC complaining of pain in his left shoulder. (Tr. at 472.) On examination, he had muscle spasm and limited range of motion of his left shoulder joint. (Tr. at 473.) However, there was no evidence of AC separation or rotator cuff tear. (Id.) Andres Arbolecia Palacio, M.D. administered pain medication and a muscle relaxer to Claimant and his symptoms completely resolved. (Id.) An x-ray of his left shoulder showed no

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

abnormalities. (Tr. at 476.) Dr. Palacio diagnosed musculoskeletal pain, muscle spasm, and left-sided radiculopathy; prescribed a short course of pain medication; and discharged Claimant that same day. (Tr. at 474.)

Ghali L. Bacha, M.D.:

Dr. Bacha, an internist, treated Claimant from January 2010 through September 2015. (Tr. at 331-364, 541-580, 585-597, 609-622, 1208-1340.) Claimant almost always denied bone or joint pain and displayed no related neurological deficits such as muscle weakness, abnormal sensation, or limited range of motion from January 2010 through April 2016. (Tr. at 338-359, 557, 569, 573, 574, 585, 591, 611, 614, 1222, 1229, 1236, 1246, 1257, 1267, 1310, 1316.)

However, on April 28, 2011, Claimant displayed limited range of motion, tenderness, and crepitation in his left shoulder. (Tr. at 360.) Dr. Bacha diagnosed left shoulder pain. (Id.) Once again, on August 9, 2011 and September 12, 2011, Claimant had crepitation and limited range of motion of his left shoulder. (Tr. at 577, 579.) Claimant again complained of shoulder pain in April 2014, and displayed decreased range of motion. (Tr. at 1319.) Dr. Bacha diagnosed joint pain. (Tr. at 1320.)

Kip Beard, M.D.:

On June 9, 2011, Dr. Beard performed an internal medicine consultative examination of Claimant. (Tr. at 365-374.) Claimant told Dr. Beard that he had experienced left shoulder pain for at least six years. (Tr. at 366.) On examination, Claimant reported mild to moderate pain and had intermittent crepitus with some limited range of motion on abduction, forward flexion, and external rotation. (Tr. at 368.) Dr. Beard found no evidence of muscle atrophy, muscle weakness, or loss of sensation of his upper or lower extremities. (Tr. at 369.) Examination of Claimant's hands

revealed no tenderness, redness, warmth, or swelling, with normal grip strength and normal range of motion. (Tr. at 368.) Claimant could also button, pick up coins, and write without difficulty. (Id.)

While Claimant complained of spine pain while bending, he could forward bend to 75 degrees, had no muscle spasm, could walk on his heels and toes, could squat, and had negative straight-leg raising. (Tr. at 369.) Dr. Beard diagnosed chronic lumbosacral strain and chronic left shoulder pain with evidence of osteoarthritis and possible internal derangement. (Id.) He concluded that while Claimant had some loss of range of motion in his left shoulder, he did not have any weakness or muscle atrophy. (Tr. at 370.)

Thomas Lauderman, D.O.:

Dr. Lauderman, a State agency physician, reviewed the medical evidence of record on June 23, 2011, and completed a residual functional capacity assessment form. (Tr. at 375-384.) He found Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours during an 8-hour workday, and stand and/or walk about 6 hours during an 8-hour workday. (Tr. at 376.) Dr. Lauderman noted Claimant should never climb ladders, ropes, or scaffolds but could occasionally perform all other postural maneuvers. (Tr. at 377.) He found Claimant had an unlimited ability to handle, finger, and feel but could not perform frequent overhead lifting with his left arm. (Tr. at 378.) Finally, Dr. Lauderman indicated Claimant needed to avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and environmental irritants and even moderate exposure to hazards. (Tr. at 379.)

Joann B. Daley M.A., M.A., Ed.S.:

Ms. Daley, a psychologist, evaluated Claimant on September 6, 2011. (Tr. at 497-503.)

Claimant drove to the evaluation, possessed a commercial driver's license, had good hygiene, and was polite and cooperative. (Tr. at 497.) He stated that he lived alone in a trailer, quit high school in 11th grade because he made poor grades and was suspended for fighting and truancy. (Tr. at 499.)

Claimant stated that he was previously married, has had several long-term girlfriends, and continued to date occasionally. (Id.) He reported having a close relationship with his family and saw his brothers regularly. (Tr. at 500.) Claimant also stated that he was friendly with his neighbors and had numerous friends with whom he socialized. (Id.) Claimant reported spending his days visiting with his mother, reading magazines such as National Geographic, sitting on his porch, and collecting old bottles and arrowheads. (Tr. at 501.)

Ms. Daley administered the Wechsler Adult Intelligence Scale 4th edition ("WAIS-IV") and Claimant obtained a full scale IQ score of 70. (Tr. at 500.) However, Ms. Daley found this score invalid because Claimant showed poor persistence and motivation on some of the subtests and that his overall functioning is at a higher level than would be predicted from a full scale IQ score of 70. (Id.) Ms. Daley diagnosed borderline intellectual functioning. (Tr. at 501.)

Bone and Joint Surgeons:

Claimant presented to Bone and Joint Surgeons on November 11, 2011 due to complaints of left shoulder pain. (Tr. at 539.) On examination, Claimant had active forward flexion and abduction of about 110 degrees (normal is 180 degrees flexion and 150 abduction), external shoulder rotation was normal. (Id.) He also had slightly reduced left shoulder strength during abduction and external rotation. (Id.) Paul S. Legg, M.D. diagnosed impingement syndrome of the left shoulder and recommended that Claimant undergo a magnetic resonance imaging (MRI) study

of his shoulder. (Tr. at 540.)

Laberta S. Salamacha, M.A.:

Psychologist Salamacha examined Claimant on April 19, 2012. (Tr. at 602-608.) Claimant reported dropping out of high school in the tenth grade due to poor grades and behavior problems. (Tr. at 602.) He reported a work history driving a coal truck for over ten years and having to quit due to undergoing heart surgery. (Id.) He also reported past work as a fabricator for a sign company and working in a cotton mill. (Id.) Claimant had been married once and reported having a girlfriend. (Tr. at 603.) He admitted having an O.K. relationship with his parents and a good relationship with his brothers. (Tr. at 602-603.) He had a valid commercial driver's license and on a daily basis watched television, walked a lot, took care of his fish tank, visited with his family, performed light housekeeping, and attended doctor's appointments. (Tr. at 603.)

Ms. Salamacha administered the WAIS-IV and Claimant obtained a verbal IQ score of 66, a perceptual IQ score of 88, a working memory IQ score of 89, a processing speed IQ score of 71, and a full scale IQ score of 74; Ms. Salamacha determined these scores to be valid, and that his deficits would prevent him from being successful in traditional educational settings. (Tr. at 604.) Ms. Salamacha also administered the Wide Range Achievement Test 4 ("WRAT-4"), and Claimant displayed a 5.4 grade reading level, a 4.3 grade sentence comprehension level, a 5.1 grade spelling level, and a 4.0 grade math computation level. (Id.) She determined that his WRAT-4 scores were primarily consistent with his currently assessed intellectual functioning, previous testing, and school performance. (Id.)

Ms. Salamacha diagnosed borderline intellectual functioning and opined that due to his mood disorder and intellectual deficits coupled with his physical condition, Claimant could not

obtain or maintain gainful employment. (Tr. at 605.) However, she did opine that Claimant could manage DIB and SSI benefits in his own interest. (Id.)

Ms. Salamacha also completed a medical source statement of Claimant's ability to perform mental work-related activities. (Tr. at 606-608.) She found Claimant had a good ability to adhere to basic standards of neatness and cleanliness, be aware of normal hazards, and take appropriate precautions. (Tr. at 607.) She opined that Claimant had a moderately or markedly limited ability to perform all other mental work-related functions. (Tr. at 606-607.)

Montgomery General Physician Clinic (MGPC):

Claimant sought treatment a MGPC for various maladies including high blood pressure, hyperglycemia, coronary artery disease, chronic obstructive pulmonary disease, depression, anxiety, and drug abuse from 2004 through 2016. (Tr. at 1146-1194, 1321-1340.) On October 9, 2015, Claimant complained of having shoulder pain and on examination, Kristina Hawkins, D.O., noted that he had joint tenderness and pain with extension. (Tr. at 1157-1158, 1324.)

Claimant once again complained of shoulder pain on December 8, 2015. (Tr. at 1326.) Dr. Hawkins noted that Claimant had joint effusions and tenderness of both shoulders and complained of pain with extension. (Tr. at 1329.) In February 2016, Claimant continued to complain of shoulder pain, and had joint effusion, joint tenderness, and pain with extension. (Tr. at 1333, 1336.)

Dr. Hawkins completed an assessment of Claimant's ability to perform physical work-related activities in July 2016. (Tr. at 1341-1343.) She opined that he could lift and/or carry less than 10 pounds during an 8-hour workday and stand and/or walk less than 2 hours and sit about 6 hours during an 8-hour workday. (Tr. at 1341.) She noted that he could sit for no more than 30 minutes at one time, stand for no more than 15 minutes at one time, and needed to walk around

every 30 minutes for ten minutes. (Tr. at 1341-1342.) When asked what medical findings supported the above limitations, Dr. Hawkins noted Claimant's poor tolerance to activity since having coronary artery bypass grafting. (Tr. at 1342.) Dr. Hawkins also noted that Claimant could occasionally twist but never stoop, crouch, or climb stairs or ladders and had a limited ability to reach, handle, finger, feel, and push or pull but did not explain what medical findings supported these limitations. (Id.)

Nicole M. Smith, M.A.:

On September 9, 2015, Ms. Smith performed a mental status examination on Claimant. (Tr. at 1088-1097.) She noted his posture was remarkable for slight lean to the left and that his gait was normal. (Tr. at 1088.) Claimant reported that he was applying for disability because of his shoulder pain, low back pain, that he cannot stay on his feet for very long and that he is depressed. (Tr. at 1089.) He also reported a history of alcohol and opiate abuse but had remained sober from opiates for three to four years, including Suboxone after having tapered down from such treatment for about a year. (Id.) He stated he was held back in the tenth grade, and had below average grades. (Tr. at 1089, 1090, 1091.)

Ms. Smith noted chronic pain was a prominent focus during the evaluation. (Tr. at 1089.) During the mental status examination, she noted Claimant was fully oriented, was cooperative, his mood depressed and anxious with broad affect. (Tr. at 1092.) His thought processes were clear though he reported a history of intermittent non-command auditory hallucinations. (Id.) His judgment was mildly impaired, insight fair, with no suicidal or homicidal ideation noted. (Id.) His immediate and remote memory was normal, his recent memory mildly impaired; his concentration and persistence were mildly impaired and his pace was normal. (Id.)

Ms. Smith diagnosed Claimant with borderline intellectual functioning "provisional" based on his reported educational history and "there was no other evidence to corroborate this diagnosis. Review of existing school records or another psychological evaluation may be needed to ascertain the claimant's current and valid level of overall intellectual and academic achievement functioning." (Tr. at 1093-1094.) Ms. Smith opined his prognosis was poor and that he may require assistance in managing his funds. (Tr. at 1094.)

Deidre Parsley, D.O.:

On October 5, 2015, Dr. Parsley of Tri-State Occupational Medicine, Inc. performed an internal medicine examination on Claimant. (Tr. at 1136-1145.) On examination, Claimant did not have tenderness in his shoulders, had forward flexion to 180 degrees on the right and 120 degrees on the left, external rotation to 90 degrees on the right and 80 degrees on the left, bilateral internal rotation to 30 degrees bilaterally, and abduction to 50 degrees bilaterally. (Tr. at 1139.) Claimant had no redness, warmth, or swelling of his hands and had normal 5/5 grip strength bilaterally. (Id.) He could also write with his dominant hand, pick up coins without difficulty, and had normal range of motion of his fingers. (Tr. at 1139-1140.) Claimant had normal 5/5 muscle strength in both upper and lower extremities and no evidence of muscle atrophy. (Tr. at 1140.) Dr. Parsley noted Claimant had some mild difficulty with balance when standing on each leg, and no evidence of cervical or lumbar radiculopathy during the examination. (Tr. at 1141.)

**School Records:**

When Claimant was in the 8th grade, his school records show that he obtained a full scale IQ score of 70. (Tr. at 192.) His school records also reflect that he earned Cs, Ds, and Fs while in junior high school and high school. (Tr. at 194.) When Claimant was 13 years old, his school

counselor referred him for an educational evaluation due to his low ability and low achievement. (Tr. at 196.) The evaluator noted that Claimant had poor concentration or a short attention span. (Id.) Following the evaluation, the examining psychological services representative recommended that Claimant remain in a regular classroom with vocational help rather than receive placement in a special education setting. (Tr. at 197, 199.)

**The Administrative Hearing(s):**

<u>Claimant Testimony:</u>

During the first administrative hearing on July 16, 2012, Claimant testified that he went as far as the tenth grade in school, and did not obtain a GED. (Tr. at 953.) He admitted that he was in trouble a lot and had difficulties getting along with others in school; when he was kicked out of school he did not go back. (Id.) Claimant stated that he has difficulty reading, that he received bad grades in school, but was not in special education classes. (Tr. at 959.) In response to the ALJ, Claimant testified that he could read and write "some", and that he could read a grocery list. (Tr. at 961.) Claimant stated that his mother will write in a manner she knows he can read, and that she takes care of any paperwork he may have. (Tr. at 965.)

Claimant testified that he has trouble raising his left arm due to pain, and estimated the most he could lift with that arm was ten pounds. (Tr. at 955-956.) His arm pain, including neck pain, interfere with his sleep, leaving him tired all day. (Tr. at 959.) Claimant stated he only takes pain medication for his left shoulder pain, but it does not help that much. (Tr. at 963.)

Claimant also testified that he sometimes has trouble walking and keeping his balance due to numbness in his feet – not the entire foot, but from the toes to the front half of his feet. (Tr. at 958.) Due to shortness of breath, he estimated he could walk about fifty to sixty yards before he

needed to stop and rest. (Tr. at 957-958, 962.) He estimated he could stand for about ten minutes before he started to feel pain in his neck and back. (Tr. at 962.)

During the second administrative hearing on August 24, 2016, Claimant confirmed that he continued to have a problem with his left shoulder, and that it hurts at night, like spasms. (Tr. at 664, 666.) Claimant testified that he feels pain in the joint and it shoots down his arm to his wrist. (Tr. at 670.) He has difficulty lifting his left arm overhead, and can lift about ten pounds, but can lift about twenty-five pounds with his right. (Tr. at 666, 671.) Claimant demonstrated that he could lift his left arm to about 90 degrees. (Tr. at 671.) Claimant testified that Dr. Hawkins limited him to lifting to ten pounds with his left hand. (Tr. at 680.) He stated that he was right-handed. (Id.)

Claimant stated he gets short of breath when walking, and ascending steps or any kind of incline makes it difficult to breathe. (Tr. at 672.) He testified that he could stand for about ten to fifteen minutes before he needed to sit back down. (Tr. at 674.)

He estimated that he could sit for probably an hour, but after twenty to thirty minutes, it would hurt. (Tr. at 673.)

Claimant testified "I can read fairly good" but he sometimes has trouble reading cursive writing, depending on who writes it. (Tr. at 677-678.) He can read a grocery list. (Tr. at 678.) He stated that he is okay with math, he can make change. (Id.)

Harry Tanzey, Vocational Expert ("VE") Testimony:

At the second administrative hearing, the VE testified that Claimant's past work as a truck driver was considered semi-skilled, his past work as a sign fabricator was considered skilled, and his past construction job was also considered skilled. (Tr. at 686.)

The ALJ asked the VE to consider a hypothetical individual of Claimant's age, education,

and work experience who could lift 20 pounds occasionally and 10 pounds frequently, could stand and walk 6 hours in an 8-hour day, and sit at least 6 hours in an 8-hour day. (Tr. at 687.) The ALJ stated the hypothetical individual could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead with the left non-dominant extremity; tolerate occasional exposure to temperature extremes, vibrations, wetness, fumes, odors, dusts, gases, poorly ventilated areas, and hazards. (Id.) In addition, the hypothetical individual could understand, remember, and carry out simple, routine, and repetitive tasks; respond appropriately to occasional superficial interactions with co-workers and supervisors where there would be no requirement for team work or over-the-shoulder supervision; could have no interaction with the general public; could not perform work with fast-paced production requirements; and could make few, if any, work-related decisions. (Tr. at 686-687.)

The VE testified that an individual with the above-stated limitations could perform light jobs as a price marker, laundry worker, and hand packer and sedentary jobs as an assembler, table worker, and grader/sorter. (Tr. at 687-688.)

The ALJ also asked the VE to consider that the individual could only lift up to 10 pounds with his left non-dominant extremity, could also only sit 20 to 30 minutes at one time, stand 15 to 20 minutes at one time, and walk 50 to 60 yards at one time. (Tr. at 689.) The VE stated that the individual would still be capable of performing the sedentary jobs of assembler and grader/sorter and could also perform the sedentary job of toy and equipment assembler. (Tr. at 689-690.)

Next, the ALJ asked the VE to consider that the individual could handle, finger, and feel frequently but not continuously. (Tr. at 690.) The VE testified that such a limitation would

eliminate all jobs. (Id.) However, if the individual did not require position changes, but could perform frequent handling, fingering, and feeling, he could still perform the light and sedentary jobs previously identified. (Tr. at 691.)

The VE also testified that if the individual could not complete an eight-hour workday, or projected to be off task fifteen to twenty percent of the time, or were absent two or more times per month, then all work activity would be precluded. (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As mentioned *supra*, Claimant alleges the ALJ erred in her analysis that he did not meet Listing 12.05C criteria. (Document No. 13 at 2-5.)

<u>Meeting or Medically Equaling a Listed Impairment:</u>

A claimant "is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.' " <u>Radford v. Colvin</u>, 734 F.3d 288, 291 (4th Cir. 2013) (citing <u>Bowen v. City of New York</u>, 476 U.S. 467, 471, 106 S. Ct. 2022, 90 L. Ed. 2d 462 (1986)). To meet or equal Subsection C of Listing § 12.05, a claimant is required to provide evidence proving: (1) an I.Q. score between 60 and 70; (2) significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation. 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.05C. A court may presume a claimant's I.Q. prior to age 22 has remained the same or approximately the same as that revealed in testing administered in connection with the disability application as long as there is no evidence to indicate a change in intellectual functioning. See <u>Branham v. Heckler</u>, 775 F.2d 1271, 1274 (4th Cir. 1985).

Moreover, the Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of § 12.05C. <u>Luckey v. U.S. Dept. of Health & Human Services</u>, 890 F.2d 666, 669 (4th Cir. 1989). A "severe" impairment is one "which significantly limits [one's] ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). This Court has previously held that "[d]eficits in adaptive functioning refer to 'adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." <u>Gibson v. Astrue</u>, No. 5:11-cv-374, 2012 WL 3985196,

at *9 (S.D.W. Va. Sept. 11, 2012) (quoting 20 C.F.R. pt. 404. Subpart P, Appendix 1, §

12.00(C)(1)). Moreover, according to the Diagnostic and Statistical Manual of Mental Disorders,

5th Edition, (DSM-V) (2013), one of the essential features of intellectual disability is impairment

in everyday adaptive functioning. Id. at 37-41. Adaptive functioning refers to how well a person

meets community standards of personal independence and social responsibility, in comparison to

others of similar age and sociocultural background. Id. at 37. Of additional importance here is that

an examiner's finding of borderline intellectual functioning does not necessarily demonstrate that

a claimant had deficits in adaptive functioning before age 22. Id. at *8-9.

In this case, the ALJ determined the evidence failed to support the presence of Listing

12.05C criteria "because the claimant does not have a valid verbal, performance or full scale IQ of

60 through 70 and a physical or other mental impairment imposing an additional and significant

work-related limitation of function." (Tr. at 639.) She noted that Claimant "had significantly

subaverage general intellectual functioning[]" and that his IQ scores "place him within the

borderline intellectual functioning range of functioning." (Id.)

> In Claimant's previous appeal, this Court noted the Fourth Circuit in Luckey ruled:
>
> Luckey's inability to perform his prior relevant work alone established the
> significant work-related limitation of function requirement of section 12.05C.
> Further, the Secretary has defined a severe impairment or combination of
> impairments as those which significantly limit an individual's physical or mental
> ability to do basic work activities. The Secretary's finding that Luckey suffers from
> a severe combination of impairments also establishes the second prong of section
> 12.05C.

Petry v. Colvin, No. 2:13-cv-32835, 2015 WL 5786769, at *7 (S.D.W. Va. Sept. 30, 2015)

(quoting Luckey, 890 F.2d at 669). In this case, the ALJ once again, found that Claimant was

incapable of performing his past relevant work. (Tr. at 647.) Therefore, the present appeal hinges

once again, on whether the ALJ complied with her duty to identify the relevant listed impairments and compare each of the listed criteria to the evidence of a claimant's symptoms. See, <u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986). In other words, the narrative concerning Claimant's deficits in adaptive functioning, if any existed prior to age 22, must be considered to determine if the criteria under 12.05C has been met.

The undersigned notes that in the previous appeal, this Court found that the ALJ failed to consider "that Claimant was kicked out of school in the tenth grade, was kicked out of school on more than one occasion, had a lot of behavioral problems, received below average and failing grades in school, and received Verbal IQ scores on 30, Performance IQ scores of 40, and Full Scale IQ of 70" when he was 14 years old. <u>Petry v. Colvin</u>, 2015 WL 5786769, at *8. The ALJ evidently heeded this Court's instruction on remand.

The ALJ first discussed Claimant's activities of daily living, finding that he had mild restrictions, noting that he "has no problems with his personal care related to psychological symptoms or limitations. He prepares simple meals, performs a little housework and occasionally walks to his mother's home (Exhibits 7E and 15E)." (Tr. at 638, 228-236, 257-264, respectively.) She noted further that Claimant watches television and reads the paper; he performs light gardening tasks, does his laundry, and basic self-care duties without assistance.[5] (Tr. at 638, 1088-1097. Additionally, the ALJ acknowledged Claimant's testimony at the more recent hearing that he drives his mother on errands, makes simple meals, visits his mother, brother and friends. (Tr. at 638.)

---

[5] The ALJ cited Ms. Nicole Smith's consultative evaluation report in support of this finding, Exhibit 26F.

With regard to Claimant's social functioning, the ALJ found he had moderate difficulties, based on the evidence that he "travels, in part, by riding in a car. He is able to go out alone and receives visits from friends; however, his friends, as well as his mother, express that he has become moody and hateful." (Id.) However, the ALJ noted that Claimant reported that he gets along "ok" with authority figures and that he shops for groceries once a week. (Id.) She also noted that he lives with his mother and that he visits his brother and friends for coffee on occasion, though he does not go to restaurants, to the movies, to church or shop at the mall. (Id.)

With regard to Claimant's concentration, persistence or pace, the ALJ considered the the consultative examination report by Ms. Daley, Claimant's Function Reports, as well as Ms. Smith's consultative examination report, and determined that he had moderate difficulties: he spends his day watching television or reading National Geographic magazine; he does not require reminders to attend to his personal care, take his medication or to go places; he drives; but he also reported problems with his memory, concentration, and his ability to focus. (Id.) The ALJ acknowledged Ms. Smith's opinion that he may require assistance in managing his funds if awarded benefits. (Id.)

In her analysis under Listing 12.05, the ALJ found Claimant

is independent in his personal grooming, had general as opposed to special education services, has a driver's license, and is independent with driving, shopping and preparing meals. Furthermore, the claimant has displayed the capacity to perform work at substantial gainful activity levels in the past.

(Tr. at 639.) The ALJ next noted that Claimant was administered the Wechsler Intelligence for Children – Revised (WISC-R) test at age 14 and that his full scale IQ score was 70. (Id.) She noted that he took another IQ test in September 2011, however, the results were deemed invalid, but

Claimant had a subsequent IQ test on April 19, 2012 during a psychological evaluation, resulting in a valid verbal IQ score of 66, perceptual IQ score of 88, and a full scale IQ score of 74. (Id.)

She acknowledged Claimant's allegations that he had low intellectual functioning as well as significant psychological symptoms, including his testimony "that he had difficulties getting along with others in school and had an expulsion after the tenth [grade]." (Tr. at 640.) The ALJ noted further that though Claimant was not in special education classes, he did not make good grades, and he reported problems reading. (Id.) The ALJ recognized that although Claimant's mother helps him with paperwork and letters, "he is able to write a grocery list and can read one if written by his mother." (Id.)

Once again, the ALJ acknowledged that Claimant worked in the past as a coal truck driver for ten years, and performed construction work prior to that. (Id.) Later on in her written decision, the ALJ revisited Claimant's school records containing his WISC-R results, and that he was evaluated at school, however, "special education placement was deemed unnecessary." (Tr. at 644.) The ALJ again considered Claimant's more recent IQ test in 2011, and that the results were invalid, but also the results of his WRAT-4 testing concerning his reading, spelling and arithmetic levels were considered valid "because the claimant worked persistently even when tasks were difficult for him." (Id.) Again, the ALJ acknowledged Ms. Daley diagnosed Claimant with borderline intellectual functioning, but "she found the claimant would be capable of managing his own benefits if awarded." (Id.)

The ALJ found that Claimant "never sought treatment for psychological symptoms and limitations; a general practitioner has rendered all treatment." (Id.) Significantly, the ALJ determined that substantial evidence did not establish that Claimant had an impairment that would

prevent him from engaging in competitive work activity. (Id.) Again, addressing Claimant's functioning, the ALJ noted he

> maintains his hygiene independently and functions adequately in the performance of routine daily tasks. He reported that he is close with his family, sees his three brothers regularly, is friendly with the neighbors, has numerous friends with whom he sits and talks, dates off and on, dresses daily, rides with an acquaintance or drives a car, watches television, listens to music, reads magazines, likes to cook, performs household chores with assistance, collects old bottles and arrow heads, goes for walks in the neighborhood and sits on his porch. There is no reason why he could not function equally well in a competitive work environment, with consideration of the additional functional limitations described above. Thus, the claimant's allegations regarding the severity and functionally limiting effects of his symptoms are not entirely consistent with the record as a whole.

(Tr. at 644-645.) Moreover, in evaluating Claimant's treating physician's opinion, the ALJ again discussed the evidence that failed to demonstrate Claimant had deficits in adaptive functioning:

> [T]he claimant[] has reported that he performs his daily self-care duties. He does laundry. He plants vegetables and harvests tomatoes. At the recent hearing, the claimant reported that he lives with his mother and prepares simple meals. He vacuums, does laundry and other simple chores, drives his mother places, and spends time with his brother. He sees his friends once a week and may go out for coffee with them. [Dr. Hawkins's] office notes and the claimant's own testimony are not supportive of the extreme findings of limitations found by Dr. Hawkins.[6]

(Tr. at 645.)

In short, the undersigned **FINDS** the ALJ's analysis was very thorough with regard to the requisite adaptive functioning analysis contemplated by Listing 12.05C, and that she provided the narrative discussion that allows for meaningful judicial review as well as having "buil[t] an accurate and logical bridge from the evidence to [her] conclusion." See Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

---

[6] The undersigned recognizes that Dr. Hawkins rendered a medical source statement that primarily concerned Claimant's physical limitations, however, the ALJ's discussion of Claimant's capabilities fall under the penumbra of adaptive functioning envisioned by the Regulations regarding Listing 12.05C.

Therefore, the undersigned **FINDS** that the ALJ's adaptive functioning analysis and finding that Claimant's impairment did not satisfy Listing 12.05C criteria is supported by substantial evidence.

<u>The RFC Assessment:</u>

With regard to the ALJ's RFC assessment, it is important to recognize that an RFC represents the *most* that an individual can do despite his limitations or restrictions. <u>See</u> Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. <u>See</u> <u>Id</u>. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Whether the ALJ's RFC assessment is erroneous by virtue of not limiting Claimant to lifting ten pounds with his left arm is another issue Claimant has raised herein. (Document No. 13 at 7.) The ALJ found Claimant's left shoulder impingement syndrome a severe impairment, but found this impairment failed to meet Listing 1.02. (Tr. at 637.) She acknowledged Claimant's testimony that he "broke a bone in his left shoulder in the past and has difficulty reaching and lifting with his left upper extremity because of pain; the most he will lift with this arm is 10 pounds . . . He treats his shoulder impairment with pain medication, which does not 'really help that much.' " (Tr. at

640.) In her review of the medical evidence of record, the ALJ noted the x-ray examination of Claimant's left shoulder on December 11, 2009 was normal. (Tr. at 642.) The ALJ considered the consultative examination performed by Dr. Beard during which Claimant reported his left shoulder pain had worsened in the last six years. (Id.) Dr. Beard's report was notable that Claimant denied having had prior treatment for his shoulder, and that his examinations of his left shoulder "revealed complaints of mild-to-moderate pain with tenderness"; and despite intermittent crepitus, Dr. Beard reported Claimant's left shoulder range of motion was normal. (Id.) The ALJ further acknowledged Dr. Legg's diagnosis of left shoulder impingement syndrome as well as his report that imaging studies "showed no acute fracture or dislocation." (Id.)

> The ALJ noted that the record
>
> reflects no actual treatment for left shoulder impingement syndrome, such as joint injections, aspirations or surgeries. In fact, despite having access to a medical card, the claimant testified at the first hearing, that he receives no treatment for his left shoulder impairment besides pain medication. A physical examination from December 2015 documents that the claimant reported pain with extension on range of motion and some tenderness of the joint. However, he had a normal inspection examination of the left shoulder with normal stability and normal muscle strength and tone.

(Tr. at 643.)

The ALJ found "[t]here is no evidence of adverse side effects from treatment or medication that would prevent the claimant from performing the jobs identified by the vocational expert. His care, post-operatively, has been entirely conservative and his condition seems stable." (Tr. at 644.)

With regard to the ALJ's finding that State agency physician Dr. Lauderman opined that Claimant "was limited to frequent reaching in all directions, including overhead, with the left upper extremity", the undersigned notes that the ALJ indeed misquoted Dr. Lauderman's opinion: he found that Claimant should ***avoid*** reaching overhead frequently with the left shoulder. (Tr. at 378.)

Nevertheless, Dr. Lauderman also opined that Claimant's exertional limitations included lifting/carrying 20 pounds occasionally and lifting/carrying 10 pounds frequently. (Tr. at 376.) He also found that Claimant was unlimited in his ability to push/pull, except as noted in the lift/carry restrictions. (Id.) He also opined that Claimant was capable of standing/walking about 6 hours in an 8-hour workday. (Id.) Importantly, the ALJ acknowledged that Dr. Lauderman opined that Claimant was capable of light work. (Tr. at 645.)

The ALJ also considered the opinion provided by Dr. Hawkins, Claimant's treating physician, that he was essentially disabled, because he could not carry more than 10 pounds frequently or occasionally or stand and walk for more than 2 hours or sit for more than 6 hours in an 8-hour workday. (Tr. at 646.) Dr. Hawkins noted these limitations "were due to his poor tolerance to activity since his coronary artery bypass graft (CABG)." (Id.) However, the ALJ recognized that not only did Dr. Hawkins's opinion conflict with her "own clinical findings (Exhibits 30F and 35F)"[7] (Tr. at 646, 1146-1194, 1321-1340.), but also with the assessments reported by Claimant's specialists who treated him for his cardiac impairment: the ALJ noted that after Claimant underwent two CABG surgeries in December 2010, his subsequent evaluations showed that he "was slowly recovering", and "[h]is post-surgery status was deemed stable in July 2011." (Tr. at 641.) Indeed, throughout 2011 and into April 2012, Claimant reported to his physicians that he was doing well, which was corroborated by his examinations. (Tr. at 641-642.)

The ALJ noted further that not until April 2015 did Claimant report chest pain and shortness of breath, but upon Dr. Hawkins's referral to his treating cardiologist, an electrocardiogram was normal, and Claimant later elected to undergo a heart catheterization in September 2015. (Tr. at

---

[7] The undersigned notes that these office records are dated from August 29, 2014 through April 8, 2016.

642, 1098-1100.) The ALJ noted the catheterization showed that Claimant had "severe 2-vessel disease and a totally occluded aortogram", and that he was to continue with "medical management." (Tr. at 642, 1134-1135.) At his follow-up with Dr. Hawkins in October 2015, the ALJ noted Claimant reported "he had 'shadows on my heart but I'd be all right.' " (Tr. at 642, 1153-1154.) Finally, the ALJ noted that Dr. Hawkins did not provide any medical findings to support her conclusions that Claimant also had limitations in all manipulative areas, only documenting "N/A". (Tr. at 646.)

The ALJ thoroughly examined the evidence of record in assessing the appropriate RFC in this case. The undersigned **FINDS** that the ALJ complied with the Regulations in her assessment, properly reconciled the conflicting evidence, and rendered an RFC that provides for the most this Claimant can do. See, generally, Youkers v. Colvin, 2014 WL 906484, at *9-10 (S.D.W. Va. March 7, 2014). Accordingly, the undersigned **FINDS** the RFC assessment accommodated Claimant's credibly established limitations supported by the record, and further, is supported by substantial evidence.

Evaluation of Symptoms in Disability Claims:

Claimant also alleges that the ALJ failed "to reconcile her finding as to [Claimant's] credibility with regard to pain on prolonged standing with her finding that he could stand for 6 hours out of 8 hours in the performance of light work." (Document No. 13 at 7.) Social Security Ruling 16-3p[8] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929

---

[8] Ruling 16-3p superseded SSR 96-7p, effective March 28, 2016, and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can be reasonably be accepted as consistent with the objective medical evidence and other evidence; explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

After properly performing the two-step process[9], the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms, and found that they were not "entirely consistent with the medical

---

[9] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

evidence and other evidence in the record[.]" (Tr. at 640.) As described *supra*, the ALJ not only reviewed the medical evidence and reconciled any internal as well as external conflicts therein, but also reviewed at length and often referred to the "other evidence", which concerned Claimant's activities of daily living that belied his allegations of the intensity, persistence and limiting effects of both his physical and mental symptoms.

Ultimately, the ALJ explicitly found Claimant's subjective symptoms inconsistent with the record as a whole "to the extent that they purport to describe a condition of disability for Social Security purposes", but at the hearing, she "offered the [RFC] above and the vocational expert was able to name jobs the claimant could perform in the local and national economy." (Tr. at 647.) In sum, the undersigned **FINDS** the ALJ complied with the Agency's Ruling and Regulations concerning the evaluation of Claimant's symptoms with the evidence of record, and her determination that his statements regarding same were not entirely consistent with both the medical and other evidence is supported by substantial evidence.

Finally, the undersigned **FINDS** the ALJ's decision that Claimant is not disabled supported by the substantial evidence.

<u>**Recommendations for Disposition**</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 13.), **GRANT** the Defendant's request to affirm the decision below (Document No. 16.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 17, 2017.

Omar J. Aboulhosn
United States Magistrate Judge